### IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DONNA WILLIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 10-CV-819-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

### OPINION AND ORDER

Claimant, Donna Willis ("Willis"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Willis' applications for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Willis appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Willis was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

At the time of the hearing before the ALJ on September 30, 2008, Willis was 38 years old. (R. 23). Willis completed tenth grade. (R. 24). Willis testified that she had worked in February 2008 for Big Lots as a cashier, but that the job had not lasted more than one month. (R. 24-25). They fired her for absences that she said were caused by illness due to diabetes and high

blood pressure. (R. 25). Willis described a series of jobs that she said lasted at most one month and ended in her quitting or being fired. (R. 25-31). She described crying spells at work as a cause of her quitting or being fired on many occasions. *Id*. She also said that she had problems at work due to inability to remember or to focus on tasks. *Id*.

Willis testified that she had been diagnosed with depression in 2000, but she believed she had always been depressed. (R. 31). She had feelings of worthlessness. *Id*. She had panic attacks and fear of being around others or talking to others. *Id*. These were daily occurrences. *Id*. She would isolate herself. *Id*. Her depression would get worse when she attempted to work, because she had to deal with rude customers and management who would not treat her respectfully. (R. 32).

She took clonazepam for anxiety, panic attacks, and depression, and she took many other medications, but she couldn't remember them. *Id*. Her opinion was that they gave her no relief from her symptoms "because it's a constant increase." *Id*. She testified that she saw her doctor every two weeks for depression. *Id*.

Willis testified that she was diagnosed with diabetes in 2000, and she had previously been on medication, but at the time of the hearing, she was controlling her diabetes with diet. (R. 32-33). She was also diagnosed with high blood pressure in 2000, and she took Enalapril for that. *Id*. She had surgery in 2000 to remove some teeth, and she had pain from that, but she did not take medication for the pain. (R. 34). She had an injury to her neck that was the result of a domestic incident in 2007 when a man hit her with a stick. *Id*. She still had pain from that injury every day, and it hurt more when she moved her head to the left. (R. 34-35). She rated the pain as a 10 on a scale of 1-to-10, and she said that the injury also caused her to lose her balance and fall. (R. 35). She said that she fell or ran into walls on a daily basis. (R. 36). She also had pain

in her left side that she testified was related to a diagnosis of a cervical problem that hurt in her hips. *Id*. She said that it felt like arthritis. She said that she could barely sit for an hour. *Id*. Her left leg down to her foot would get numb if she sat for an hour or more. *Id*. She said she had experienced that pain since 1993, and she also described it as a 10 on the pain scale. *Id*. To obtain relief, she would lie down on her right side for more than an hour, and sometimes for the whole day. (R. 37).

Willis testified that she had trouble standing late in the day and when she got out of bed in the morning, but during the day she estimated that she could stand for an hour. *Id*. After that hour, she would need to sit down or lie down. *Id*.

Willis had surgery on her left wrist and on a finger of her left hand, and she said that she experienced pain from those combined conditions that she also rated as a 10 on the pain scale. (R. 39-40).

At the time of the hearing, Willis was taking Prilosec for acid reflux. (R. 40). She described digestive trouble in part caused by her missing teeth and lack of appetite. (R. 40-41).

Willis also testified that she had difficulty sleeping, and she would awaken three or four times every night. (R. 41).

Willis said that she experienced mood swings ten times during a day. (R. 42). She described incidents when she became angry or irritated, and she said that she had thrown things at work on four or five occasions. (R. 42-43). She experienced auditory hallucinations about five times a week, and she experienced visual hallucinations five times a day. (R. 43-44).

She said that she had trouble with reading comprehension, and she had failed the GED examination due to lack of comprehension and math troubles. (R. 44). Willis also testified that she had trouble finishing tasks, and she described that she might start three different household

3

tasks, such as cleaning the bathroom, washing dishes, or sweeping the floor, without completing any of them.  *Id*.  She had trouble completing tasks on the job, and she would have to be given instructions more than once.  (R. 45).  Her medications had side effects of drowsiness and headaches.  *Id*.  She experienced headaches every day.  *Id*.  Willis testified that, due to her diabetes, she had to take frequent bathroom breaks.  *Id*.

Willis said that she was hospitalized at Hillcrest in 2007 due to mental issues.  (R. 46).  At the time, she had feelings of worthlessness, and she wanted to make sure she didn't harm herself.  *Id*.  While the hospital wanted her to stay for 72 hours, she went home after 24 hours, because she was uncomfortable being in close proximity to other people, and she wanted to be alone.  *Id*.

Willis testified that she had no hobbies and she spent her day at home.  (R. 47).  She said that she found it hard to leave her house because she felt anxious, overwhelmed, nervous, and in fear for her life.  *Id*.  She sometimes drove, but only to the store, which was less than a mile from her house.  *Id*.  She didn't drive more because of her pain and her inability to pay attention.  *Id*.  She didn't wash dishes or cook because she didn't want to.  (R. 48).  She didn't go to the store because she felt overwhelmed, irritated, angry, and as though "things are closing in on me."  *Id*.  She could not climb stairs due to the pain in her legs, and she could walk less than a mile.  (R. 48-49).

Willis was seen at the OSU Health Care Center (the "OSU Clinic") on September 16, 2002.  (R. 257).  Her complaints appeared to be insomnia, headache, "ulcers," and gynecological concerns.  *Id*.  On physical examination, Willis' extremities had full range of movement, and there were no notes that indicated pain.  *Id*.  The assessments were generalized anxiety disorder, mild depression, and peptic ulcer disease.  *Id*.  Effexor and Prevacid were prescribed.  *Id*.  Willis

4

returned to the OSU Clinic on November 11, 2002 with a complaint of pain during her menstrual periods, and she was prescribed Ultram. (R. 256).

At a well woman checkup at the OSU Clinic on March 18, 2003, Willis complained that her stomach had been uncomfortable and that she had lower back and leg pain. (R. 253). She was given a prescription for Ultracet with 2 refills. *Id.*

Medical records from Saint Francis Hospital on January 8, 2004 reflect that Willis took 8 Ultram pills at one time. (R. 235-42). Willis denied that she was trying to hurt herself, and she told the physicians that she took them because she was tired. (R. 237).

Willis apparently sought care at the OU Tulsa Bedlam Community Health Clinic (the "Bedlam Clinic") on January 10, 2006, but the copies of this encounter that are included in the administrative transcript are difficult to decipher because they are missing a portion of the left side of each page. (R. 243-49). It appears that her complaint was vertigo. (R. 248). The assessment and plan seem to discuss Diazepam and Willis' lack of Enalapril which resulted in her hypertension being under poor control. (R. 249).

Willis attended the OSU Clinic on February 27, 2006 and stated that she wanted to transfer her care from the Bedlam Clinic. (R. 254-55). Assessments were non-insulin-dependent diabetes mellitus, hypertension, hyperlipidemia, and allergic rhinitis. (R. 255). Apparently several medications were prescribed, and Willis was to return to the clinic in two weeks. *Id.*

Willis returned on March 13, 2006 for a follow up of her diabetes and depression. (R. 252). Willis wanted to discontinue Effexor due to side effects. *Id.* On examination, there were no abnormal findings, no tenderness was noted, and Willis had normal range of motion. *Id.* The impressions were uncontrolled diabetes, hypertension, depression, and anxiety. (R. 251). Her medications were adjusted. *Id.*

A treatment plan at Family & Children's Services ("F&CS") was signed by Willis on April 16, 2006. (R. 265-74). Diagnoses included on Axis I[1] were major depressive disorder, recurrent, with psychotic features, anxiety disorder not otherwise specified, and adjustment disorder with mixed anxiety. (R. 273). Her global assessment of functioning ("GAF")[2] was stated as 48. (R. 274). There is no indication that the treatment plan was reviewed or signed by a physician, but Willis was evaluated by a physician on July 11, 2006. (R. 283). At the time of that evaluation, Willis' chief complaint was constant crying. *Id*. It appears that perhaps pages are missing from this evaluation, because it only reflects Willis' history. *Id*. A medication record also dated July 11, 2006 shows that Willis was prescribed Seroquel and Lamictal. (R. 282).

Willis saw another physician at F&CS on August 8, 2006, at which time her symptoms had not improved. (R. 365). The assessment appears to be bipolar I disorder. *Id*. Willis' medications were increased. *Id*. On September 28, 2006, an F&CS physician noted that Lamictal had been discontinued due to development of a rash, and Willis had been crying a lot

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

[2] The GAF score represents Axis V of the multiaxial assessment system. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-36 (Text Revision 4th ed. 2000). A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

since then. (R. 349). The physician again appeared to assess bipolar I disorder, and prescribed Effexor and Seroquel. *Id*. On October 16, 2006, Willis reported that she had been getting angered easily, throwing things, and "having fits." (R. 348). It appears that Effexor was discontinued and that Seroquel was increased. (R. 344, 348).

On October 26, 2006, Willis presented to the OU Physicians - Tulsa Family Medicine clinic with a chief complaint of swelling of her hands, feet, and face. (R. 413-14). She was seen at this clinic for depression on January 29, 2007, and for a rash on May 16, 2007. (R. 407-12).

Another treatment plan is included in the F&CS records with an apparent date of November 9, 2006. (R. 327-37). The Axis I diagnoses are major depressive disorder, recurrent, with psychotic features, and panic disorder without agoraphobia. (R. 336). Willis' GAF is stated as 55. (R. 337). The document appears to have been signed by a therapist, but not by Willis or a medical doctor. (R. 327-37). On December 18, 2006, Willis reported to F&CS that she was stable and doing well when on medications, but was irritable and angry when she ran out of medications. (R. 343).

On June 12, 2008, Willis was seen for medications management at the OU Psychiatry Clinic. (R. 448-55). The record states that Willis had gone to Hillcrest due to "really bad" panic attacks, and she only stayed for 24 hours, although they wanted to keep her longer. (R. 448). Willis reported that her mood was low, she was easily irritated, she was not sleeping well due to worrying, and her concentration was poor. *Id*. On examination, the physician found that Willis was oriented, and her memory and concentration appeared to be intact. (R. 450-51). The physician assessed that Willis' insight was fair, her judgment was mildly impaired, and she tended to use blaming as a defense. (R. 451). The physician added a personality disorder to Axis II assessments because Willis had lack of improvement with medications, difficulty establishing

a connection with a therapist, reluctance to participate in therapy, and a tendency to blame others. *Id*. The assessments on Axis I were major depressive disorder, recurrent, mild; social phobia; and panic disorder with agoraphobia. *Id*. Willis' GAF was scored as 60. (R 453). Willis was prescribed clonazepam, Cymbalta, and Ambien. (R. 448, 450).

Willis was seen again at the OU Psychiatry Clinic on July 17, 2008 for follow up. (R. 443-47). Willis reported that she had not done well since her previous visit. (R. 443). The physician assessed Willis as oriented, with intact memory and concentration. (R. 444-45). She was assessed as having good insight and no impairment in judgment. (R. 445). Axis I assessments were uncomplicated bereavement, major depressive disorder, recurrent, mild, and panic disorder with agoraphobia, and the Axis II assessment was continued as personality disorder not otherwise specified. *Id*. Willis' GAF was scored as 60. (R. 445-46). She was prescribed Remeron, Ambien, and Cymbalta. (R. 444).

Willis was seen at the OU Internal Medicine Clinic on July 23, 2008 with chief complaints of diabetes and pelvic pain. (R. 436-42). Physical examination was normal. (R. 439). The physician's conclusion was that Willis' pelvic pain was probably due to stress, and Willis' medications were adjusted. *Id*.

Willis was seen for follow up at the OU Psychiatry Clinic on August 21, 2008. (R. 427-30). Willis reported that she had been arrested for unpaid court costs, which triggered a panic attack. (R. 428). Willis reported that she was "still pursuing therapy," and she had a job interview. *Id*. The physician continued essentially the same assessments and adjusted Willis' medications. (R. 427-30).

Willis was seen again at the OU Internal Medicine Clinic on October 8, 2008 for follow up of an emergency room visit for pelvic pain. (R. 489-92). The physician ordered additional

laboratory tests. (R. 491-92).

An F&CS physician signed a Mental Status Form dated June 13, 2006. (R. 264). Many responses to the form started with "Client reports," such as "Client reports significant difficulty in concentration [and] focus . . ." *Id*. The form also stated that Willis had just begun treatment with "minimal improvement." *Id*. Diagnoses were given with numerical codes[3] which apparently correspond to major depressive disorder, recurrent, severe, with psychotic features, and unspecified anxiety state.

Willis was seen for a mental status examination by agency consultant Dennis A. Rawlings, Ph.D. on September 11, 2006. (R. 291-97). After reviewing Willis' history and complaints, Dr. Rawlings stated the results of his examination. (R. 291-93). He said that Willis was not oriented to the date or the season, but was otherwise oriented. (R. 293). Dr. Rawlings said that Willis' performance on examination suggested that her attention span was adequate and her working memory was mildly impaired. (R. 294). On the mini mental status exam, Willis scored 27 out of 30 points. *Id*. Dr. Rawlings wrote that Willis could recall and carry out simple tasks on that test. (R. 295). Dr. Rawlings believed that Willis' "abstraction abilities" were "borderline to deficient." (R. 294). His diagnoses on Axis I were bipolar I disorder, most recent episode mixed, with psychotic features, rapid cycling, improving, and panic disorder with agoraphobia. (R. 295). On Axis II, he diagnosed schizoid personality disorder. (R. 296). He scored Willis' current GAF as 50, with a highest GAF in the past year of 60. *Id*.

---

[3] The International Classification of Diseases, 9th edition - Clinical Model coding system is a medically-recognized ranking of diagnoses. *See Little Company of Mary Hosp. v. Shalala*, 24 F.3d 984, 986-87 (7th Cir. 1994).

Janice B. Smith, Ph.D., a nonexamining agency consultant, completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment on September 28, 2006. (R. 299-316). For Listing 12.04, Dr. Smith noted Willis' depressive syndrome. (R. 302). For Listing 12.06, she noted Willis' panic disorder with agoraphobia. (R. 304). For Listing 12.08, she noted the diagnosis of schizoid personality disorder. (R. 306). For Listing 12.09, she noted a history of alcohol abuse. (R. 307). For the "Paragraph B Criteria,"[4] Dr. Smith assessed Willis with a mild degree of limitation in her activities of daily living, and moderate difficulties in her social functioning, and in her concentration, persistence or pace. (R. 309). Dr. Smith found one or two episodes of decompensation. *Id.* In the "Consultant's Notes" portion of the form, Dr. Smith reviewed Willis' report of symptoms and her history of mental health treatment. (R. 310). She reviewed records from F&CS, including the Mental Status Form dated June 13, 2006. *Id*. Dr. Smith also briefly summarized the report of Dr. Rawlings, and she concluded that Willis "appears to be able to do simple work that does not require intense concentration or extensive interpersonal contact." *Id*.

On the Mental Residual Functional Capacity Assessment form, Dr. Smith found that Willis was markedly limited in her ability to understand, remember, and carry out detailed instructions. (R. 313). She also found a marked limitation of Willis' ability to interact appropriately with the general public. (R. 314). Dr. Smith found that Willis was moderately

---

[4]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

limited in her ability to maintain attention and concentration for extended periods, her ability to accept instructions and respond appropriately to criticism from supervisors, and her ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes. (R. 313-14). In her narrative comments, Dr. Smith wrote:

> [Willis] is able to understand, remember, and carry out simple, but not detailed, tasks that do not require intense concentration. She is able to work under routine supervision. She is able to complete a normal work day and work week from a mental standpoint, and she can adapt to a work setting. She cannot relate effectively to the general public. She can work in a setting in which she works primarily alone, with only intermittent and superficial interactions with coworkers and supervisors for work purposes.

(R. 315).

Willis was seen by agency consultant Angelo Dalessandro, D.O. for an examination on September 6, 2006. (R. 284-90). Dr. Dalessandro stated that Willis' chief complaint was her mental problems. (R. 284). Willis reported indigestion and heartburn, as well as gastroesophageal reflux disease and a history of ulcers. (R. 285). She also reported shortness of breath on exertion, high blood pressure, chronic fatigue, and diabetes. *Id*. Willis stated that she had pain in her low back, knees, elbows, and shoulders, swelling in her feet, and numbness in her left arm, her hands, and her legs. *Id*. She reported headaches, dizziness, and difficulty sleeping, in addition to her mental symptoms. *Id*. On examination, Dr. Dalessandro noted tenderness in the left costochondral area on palpation and upper right quadrant and epigastric tenderness on palpation. *Id*. There was tenderness in Willis' left shoulder, with normal range of motion. (R. 286). There was tenderness in her left knee, as well as in the left paravertebral area and in the right lumbodorsal area. *Id*. Dr. Dalessandro's impressions were diabetes with peripheral neuropathy, hypertension, bipolar disorder by history, chronic left shoulder and left knee strain, chronic back strain, and gastroesophageal reflux disease. *Id*.

11

Nonexamining consultant Carmen Bird, M.D., completed a Physical Residual Functional Capacity Assessment on September 28, 2006. (R. 317-24). Dr. Bird found Willis' exertional limitations to be consistent with light work. (R. 318). In explanation of this determination, Dr. Bird noted that Willis' physical treatment notes were limited and mostly focused on diabetes and hypertension. *Id*. Dr. Bird briefly summarized Dr. Dalessandro's report. *Id*. Dr. Bird found that Willis could only occasionally stoop. (R. 319). She found no other significant limitations. (R. 320-24).

## Procedural History

Willis filed applications for disability insurance benefits and for supplemental security income under Titles II and XVI, 42 U.S.C. §§ 401 *et seq.* (R. 154-62). The applications were denied initially and on reconsideration. (77-85, 91-96). A hearing before ALJ Charles Headrick was held September 30, 2008 in Tulsa, Oklahoma. (R. 18-58). By decision dated January 6, 2009, the ALJ found that Willis was not disabled at any time through the date of the decision. (R. 10-17). On October 29, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[5] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.

---

[5]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

*Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Willis' last date insured was September 30, 2008. (R. 12). At Step One, the ALJ found that Willis had not engaged in any substantial gainful activity since her alleged onset date of July 8, 2004. *Id.* At Step Two, the ALJ found that Willis had severe impairments of bipolar disorder, major depression, and panic disorder. *Id.* The ALJ stated that Willis' diabetes and hypertension appeared to be controlled. (R. 13). He stated that Dr. Dalessandro's September 6, 2006 physical examination was "unremarkable." *Id.* He therefore found that Willis had no medically determinable physical impairments. *Id.* At Step Three, the ALJ found that Willis' impairments did not meet a Listing. *Id.*

The ALJ determined that Willis had the RFC to perform the full range of work at all exertional levels, with the following nonexertional limitations:

> [Willis] is able to understand, remember, and carry out simple, but not detailed, tasks that do not require intense concentration. She is able to work under routine supervision. She is able to complete a normal work day and work week from a mental standpoint, and she can adapt to a work setting. She cannot relate effectively to the general public. She can work in a setting in which she works primarily alone, with only intermittent and superficial interactions with coworkers and supervisors for work purposes.

(R. 13-14). At Step Four, the ALJ found that Willis could perform her past relevant work as a packager. (R. 15). As an alternative ruling, at Step Five the ALJ found that there were jobs in significant numbers in the economy that Willis could perform, taking into account her age, education, work experience, and RFC. (R. 16-17). Therefore, the ALJ found that Willis was not disabled at any time from July 8, 2004 through the date of his decision. (R. 17).

14

**Review**

Willis raises several issues on appeal. Because the undersigned finds that the ALJ erred in his consideration of the opinion evidence of Dr. Dalessandro and Dr. Bird, this case must be reversed and remanded for further consideration. Because reversal is required by the issue relating to the consulting experts, the other issues raised by Willis are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). The regulations of the Social Security Administration require that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 416.927(d); *see also* SSR 96-5p, 1996 WL 374183 ("[O]pinions from any medical source about issues reserved to the Commissioner must never be ignored."). An ALJ must consider the opinion evidence and, if he rejects it, he must provide specific legitimate reasons for the rejection. *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished), *citing Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003). If an ALJ's RFC determination conflicts with a medical opinion, then the ALJ must explain why the opinion was not adopted. *Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished), *citing* SSR 96-8p, 1996 WL 374184; *Ramirez v. Astrue*, 255 Fed. Appx. 327, 332-33 (10th Cir. 2007) (unpublished) (directing ALJ on remand to make specific findings explaining why he did not adopt opinions of consulting examiner).

In the present case, Dr. Dalessandro, the agency's consulting examiner, and Dr. Bird, the agency's nonexamining consultant, both prepared reports regarding Willis' physical impairments. (R. 284-90, 317-24). Dr. Dalessandro made specific findings that Willis had physical impairments, including chronic left shoulder and left knee strain and chronic back strain. (R.

286).  Dr. Bird reviewed Dr. Dalessandro's report as well as other evidence in the file, and she concluded that Willis was limited to light work with only occasional stooping.  (R. 318-19).

In spite of this opinion evidence from Dr. Dalessandro and Dr. Bird, the ALJ made a RFC determination that conflicted with their reports by finding that Willis could perform work at all exertional levels.  (R. 13-14).  The only explanation made by the ALJ was given at Step Two, and it is not adequate to support an RFC finding that diverges to such a large degree from the reports of the agency's own experts.  (R. 13).  The ALJ first discounted Willis' diabetes and hypertension as controlled and having only minimal effect on Willis' ability to perform work.  *Id*. He stated that Willis alleged a multitude of physical problems and then characterized Dr. Dalessandro's examination as "unremarkable."  *Id*.  He therefore found that Willis did not have a medically determinable physical impairment.  *Id*.  The ALJ did not mention Dr. Bird's Physical Residual Functional Capacity Assessment in his decision.  (R. 10-17).

As discussed above, the ALJ was required to consider the opinion evidence and, if his RFC determination conflicted with that evidence, he was required to explain why.  In this case, the ALJ did not consider the opinion evidence, and his finding of no physical impairments at Step Two as well as his RFC determination expressly conflicted with that opinion evidence. Reversal is therefore required to allow the ALJ to properly consider and account for this evidence.

While it is not necessary for this Court to address the other issues raised by Willis, the Court takes this opportunity to comment on the ALJ's method of propounding a hypothetical to the vocational expert (the "VE") at Step Five.  At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account his age, education, work experience and RFC.  *Haddock v. Apfel*, 196 F.3d

16

1084, 1088-89 (10th Cir. 1999).  The ALJ is allowed to do this through the testimony of a VE. *Id.* at 1089.  Here, the ALJ's method of asking the VE the hypothetical at Step Five was to ask her to assume physical capacity consistent with Dr. Bird's Physical Residual Functional Capacity Assessment, and mental limitations consistent with Dr. Smith's Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment.  (R. 54).  The Tenth Circuit recently approved in a footnote of concerns the undersigned expressed regarding the use of forms completed by an expert as a "shortcut" in asking a proper hypothetical of the VE:

> A complete question paired with a complete answer in the transcript is highly desirable.  The undersigned understands that at times the RFC determinations are extensive in their detailed findings and that resort to forms that have been previously completed by experts, or, in this case, to testimony of the medical expert, is a tempting shortcut.  That shortcut too often leaves the reviewing court with difficulty in determining if the people sitting in the hearing room all were asking questions, giving testimony, and listening to testimony regarding the same hypothetical RFC.  If the reviewing court cannot meaningfully review the proceedings below, then it is forced to find that the record does not contain substantial evidence supporting the ALJ's decision.

*Sitsler v. Astrue*, 410 Fed. Appx. 112, 120 n.4 (10th Cir. 2011) (unpublished).  The undersigned urges the Commissioner to ensure that all ALJs state their findings of the functional abilities of the claimants out loud when they are propounding a hypothetical question to the VE, rather than resort to forms.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993).  This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case.  *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

Because the error of the ALJ related to Willis' physical impairments requires reversal, the undersigned does not address the remaining contentions of Willis. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Willis.

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 29th day of March, 2012.

_____
Paul J. Cleary
United States Magistrate Judge